**SO ORDERED.**

**SIGNED this 15 day of February, 2013.**

_____
**J. Rich Leonard
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

BURCAM CAPITAL II, LLC,                             CASE NO. 12-04729-8-JRL

   DEBTOR.                                          CHAPTER 11

ORDER

These matters came before the court on CWCapital Asset Management LLC's ("CWCapital") motion to dismiss the chapter 11 bankruptcy case, the confirmation hearing of the debtor's chapter 11 plan, and the debtor's motion to designate ballots pursuant to 11 U.S.C. § 1126(e).[1] A hearing on the matters took place in Raleigh, North Carolina on January 31, 2013 and February 1, 2013.

BACKGROUND

The debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code on June 28, 2012. On September 26, 2012, the debtor filed its chapter 11 plan and disclosure statement. An order conditionally approving the disclosure statement and setting a hearing on confirmation of plan

---

[1] Based on the ruling set forth in this order, the debtor's designation motion is rendered moot. If the ruling is overturned on appeal, the designation motion will be before this court.

was entered on September 27, 2012, with ballots due on November 29, 2012. The ballot report, filed on January 30, 2013, showed eighteen rejecting votes and two accepting votes. All eighteen rejections were voted by CWCapital.[2] Two of the rejections corresponded to CWCapital's secured claims, treated in classes 3 and 4, and the other sixteen rejections were unsecured claims that CWCapital had purchased or otherwise been assigned. On December 12, 2012, the debtor filed a first modification to chapter 11 plan and supplement to its disclosure statement. CWCapital filed objections to both the original chapter 11 plan and the modified plan and moved to dismiss the case.

This case involves a debtor who owns a mixed-use building in the Glenwood South area of Raleigh, North Carolina. The only secured creditor in this case is CWCapital, which as Special Servicer for Bank of America and US Bank National Association, holds two promissory notes secured by deeds of trust on the building located at 510 Glenwood Avenue. In its schedules, the debtor listed the amounts due on the notes as $11,453,808.08 due on Note A and $782,245.37 due on Note B. CWCapital has filed proofs of claim in the amounts of $14,014,329.16 and $1,115,569.43.[3] The real property which secures these notes includes a commercial building of office and retail space, and a parking garage. The property is valued at between $17.3 million and

---

[2]CWCapital is acting in its capacity as Special Servicer for U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor by merger to LaSalle Bank National Association, as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2004-GG1, Commerical Mortgage Pass-Through Certificates, Series 2004-GG1 ("A Note Holder") and Bank of America, N.A., successor by merger to LaSalle Bank National Association, as Trustee for the Registered Holders of Mezz Cap Commercial Mortgage Pass-Through Certificates, Series 2004-C1 ("B Note Holder").

[3]The debtor has objected to CWCapital's claims based on the inclusion of pre-payment penalties of over $1,000,000.00. That dispute is not before the court today.

$18.5 million.[4]  According to the debtor's schedule F, the unsecured nonpriority claims total $41,798.54.  Both the original plan and the plan as modified propose payment to the debtor's creditors in full.

The original plan provided treatment of the debtors' unsecured creditors in two classes: Class 5 housed the allowed general unsecured claims and class 6, the allowed small unsecured claims. Class 5 claims would be paid in quarterly installments of $5,000.00, commencing three months after the effective date, with interest at the federal judgment rate on confirmation.  Treatment of class 6 provided that these claims would be paid in full in 120 days after the effective date.

The ballots received showed that CWCapital had purchased sixteen of the unsecured claims and filed rejecting ballots for each of those claims.  The purpose of this purchase was to block confirmation of the plan.  Of the two accepting votes, one came from a claimant in class 5 and the other from a claimant in class 6.  It appears to the court that fifteen other claimants, holding approximately $7,880.23 in claims, in the two unsecured classes did not submit ballots.

Subsequent to receiving the ballots but prior to confirmation, the debtor modified the plan and supplemented the disclosure statement.  The modification created a third class of allowed unsecured claims in which the claims purchased by or assigned to CWCapital were placed.  The treatment given to this new class, class 4A, was different than the class 5 and 6 treatment.  The treatment provided that class 4A's allowed claim be secured by a new deed of trust on the debtor's real property and amortized over ten years at the Secured Rate (3.75%) with the debtor making monthly payments.  The supplement to the disclosure statement explained the modification was due

---

[4]These figures come from the appraisal done by Integra Realty Resources commissioned by the debtor. The appraisal listed the market value as is on August 21, 2012 as $17,310,000.00 and the prospective market value at stabilization on September 1, 2013 as $18,490,000.00.

to the debtor's belief that the secured creditor's purchase of claims put the secured creditor at odds with the interests of the debtor's remaining unsecured creditors and that the treatment of the new class is more reasonable for an institutional creditor. At the hearing, debtor's counsel stated that the justification for this separate classification was, in part, the debtor's desire to first pay the trade creditors with whom it continues to have business relationships.

## DISCUSSION

**1.    Compliance with Chapter 11 Provisions**

*a.    Modification*

With respect to modification of a plan prior to confirmation, Section 1127(a) of the Bankruptcy Code provides:

> The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

11 U.S.C. § 1127(a). Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected the plan as modified, unless, the holder changes the previous acceptance or rejection in the time afforded by the court. 11 U.S.C. § 1127(d). Rule 3019(a) of the Federal Rules of Bankruptcy Procedure clarifies the procedure when a plan has been accepted and is subsequently modified:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously

accepted the plan.

Fed. R. Bankr. P. 3019(a). The inquiry of whether a modification has materially and adversely effected the treatment of creditors is important when a creditor accepted the original plan and now is receiving different treatment. If the modification is material and adversely affects the way the creditors are treated, then re-balloting of the plan is required. In re G-I Holdings Inc., 420 B.R. 216, 256 (D.N.J. 2009). The best test of whether a modification is material is "whether the modification so affects any creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance." Id. (quoting 9 COLLIER ON BANKRUPTCY ¶ 3019.01 (15th ed. rev. 2009)).

Here, the modification occurred post-balloting but prior to confirmation. The inquiry of whether the modification requires re-balloting is inapposite here because that analysis contemplates *accepting* ballots receiving adverse treatment. Here, CWCapital had already voted to reject the plan, so any re-balloting would not produce a different result, CWCapital would still reject the plan. The treatment of classes 5 and 6 did not change, so they are deemed to accept the modified plan.

Since the modified plan is deemed to be the plan at the time the modification is filed and no re-balloting is required, the analysis turns to whether the plan is confirmable. Both 11 U.S.C. § 1127(a) and § 1129(a)(1) require that a plan, or modified plan, comply with the applicable provisions of chapter 11.

### b.  *Classification*

A plan may place a claim in a particular class only if such claim is substantially similar to the other claims of the class. 11 U.S.C. § 1122(a). This does not require that all similar claims be included within a single class. In re Deep River Warehouse, Inc., 2005 WL 2319201, *4 (Bankr.

M.D.N.C. Sept. 22, 2005); In re Atlanta West VI, 91 B.R. 620, 625 (Bankr. N.D. Ga. 1988); In re Mason & Dixon Lines Inc., 63 B.R. 176, 181 (Bankr. M.D.N.C. 1986). Chapter 11 plan proponents are to be given considerable discretion in classifying claims according to facts and circumstances of their cases. In re Holywell Corp., 913 F.2d 873, 880 (11th Cir. 1990); In re Piece Goods Shops Co., 188 B.R. 778 (Bankr. M.D.N.C. 1995).

The Fourth Circuit's classification analysis is articulated in Travelers Insurance Co. v. Bryson Props., XVIII (In re Bryson Props., XVIII), 961 F.2d 496 (4th Cir. 1992) and requires a legitimate business justification for separate classification of similar claims and different treatment for the separate classes. In Bryson Properties, separate classification of substantially similar claims, where the separate classes received the same treatment, and no legitimate business reason was given, was found to be clearly for the purposes of manipulating the vote. Id. at 501-02.

Separate classification for creditors with whom the debtor intends to continue to do business is a legitimate business purpose. In re Snyders Drug Stores, Inc., 307 B.R. 889, 894 (Bankr. S.D. Ohio 2004) ("The need to maintain good will for future operations can be [a legitimate business] reason" that would support separate classification.); In re Coram Healthcare, Corp., 315 B.R. 321, 349 (Bankr. D. Del. 2004) ("separate classification and treatment of trade claims is acceptable if the separate classification is justified because they are essential to a reorganized debtor's ongoing business"). Claims also may be separately classified when institutional lenders are prepared to accept debt or equity securities in circumstances in which trade creditors would prefer cash payment of a percentage of their claims. 7 COLLIER ON BANKRUPTCY ¶ 1122.03[3][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

In Deep River Warehouse, the court addressed the question of whether the classification of

a creditor's unsecured deficiency claim separate from other unsecured creditors was proper. 2005 WL 2319201 at *4. The court "recognize[d] reasons that may exist to separately classify deficiency claims and trade creditor claims." Id. at *7. In that case, however, the debtor failed to "provide important indicia that the motive behind the separate classification [was] non-manipulative." Id. Additionally, the plan proposed to treat both the trade creditors and the deficiency claim the same, making the separate classification highly suspect. *"If the two classes received different treatment under the Plan, for legitimate reasons, then the separate classification might be viewed in a different light."* Id. (emphasis added); see In re Grandfather Mountain Ltd. P'ship., 207 B.R. 475, 484 (Bankr. M.D.N.C. 1996) (differences between a deficiency claim and unsecured trade claims were significant, legally distinguishing differences warranting separate classification where the two classes were given different treatment).

    Here, the debtor has classified the unsecured claims into three categories. Class 5 holds the general unsecured claims, class 6 is the small unsecured claims, or the administrative convenience class, and class 4A contains the claims purchased by CWCapital. There is nothing impermissible with having a small claims class as Section 1122(b) allows for such an administrative convenience class. The justifications given for classifying the purchased claims separate from the other classes included the debtor's desire to maintain trade and professional relationships with the creditors contained in classes 5 and 6. Paying such creditors quickly fosters relationships for future business. That rationale simply does not apply to the claims which were purchased by CWCapital. The impetus to pay an off-duty police officer's claim quickly is no longer a driving force once an institutional creditor such as CWCapital purchases the claim. Therefore, the desire to pay the unsecured claims not purchased by CWCapital more quickly is a legitimate business purpose.

Furthermore, the treatment afforded to CWCapital's purchased claims does not harm the creditor and is typical of treatment given to a secured creditor. Similar to classifying a deficiency claim apart from other unsecured claims, the class 4A treatment acknowledges the differences that exist between trade creditor claims and claims held by an institutional creditor.

In order to meet the requirements set forth in Bryson, separate classification of similar claims must be for a legitimate business purpose *and* the classes must receive different treatment under the plan. Here, the debtor has articulated a legitimate business interest in paying trade creditors off quickly as to ensure good will for future business endeavors. Additionally, the separate classes receive different treatment under the plan. As such, the classification set forth in the plan will stand. Based on the classification and the ballots received, the debtor has two accepting impaired classes, class 5 and class 6.

## 2.    **Cramdown Rate of Interest**

The court may approve a plan over the objection of an impaired class if the plan satisfies the requirements of Section 1129(b) of the Code and "is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b). Here, the issue is whether the debtor's proposed rate of interest and amortization period is fair and equitable to CWCapital. In determining the appropriate rate of interest the court must first consider whether there is an effective market for the proposed loan. In his report, the creditor's expert stated that there was no effective market for a new loan to repay the claim. In the absence of an effective market, the court will turn to the formula approach outlined in Till v. SCS Credit Corporation, 541 U.S. 465 (2004), to construct the appropriate interest rate. Under Till, the court starts with the prime rate of interest and adjusts based on risk. "The appropriate size of that risk adjustment depends, of

course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." Id. at 479. "Secondary factors include the loan to value ratio and quality of the guarantors. The final rate is determined by the plan before the court at confirmation." In re Smithville Crossing, LLC, 2011 WL 5909527, *8 (Bankr. E.D.N.C. Sept. 28 2011).

In conducting the Till analysis, the court has carefully considered the testimony of the experts offered by each party. The expert for the debtor, John Logan, testified that a fully-secured property of this type in today's market, with a ten-year note amortized over twenty-five years, would fall in the range of 3.75% to 4.25%. However, he admitted that this rate would be based on a loan-to-value ratio of less than 75%, which this property cannot achieve. In contrast, the expert for the creditor, Franklind Lea, performed a Till analysis and concluded that the appropriate rate is 8.5%.

In looking to the Till factors, the court turns first to the nature of the security. The collateral in this case is a mixed-use building consisting of office and retail space and an adjacent parking deck. By all measures, it is a desirable property that is well-maintained, in a vibrant and growing part of the city. A new hotel has just opened adjacent to the property that increases its revenue by a long-term rental of parking spaces. At least three new apartment complexes are currently under construction within walking distance of the property. The appraised value by the debtor's appraiser, $17,310,000.00 as of August 21, 2012 and $18,490,000.00 at stabilization this September, is reasonable. Thus it appears that the value of the property will hold firm and likely appreciate during the ten-year term of this loan. On the other hand, the court takes note of the manner in which the market is valuing collateral such as this in 2012 fourth-quarter loans of a pristine nature. Mr. Lea's chart shows that office loans require an interest rate of 5.15%, and retail loans a rate of 4.83% due

to the inherent nature of this type of collateral. Creditor's Exhibit 6 at 2. Accordingly, the court finds that the nature of the collateral requires a rate of 5%.

Turning to the circumstances of the estate, the court finds that the debtor's projections show that it has the ability to service the secured debt without difficulty. Although some of the restaurant space is currently vacant, restaurant leases in this area of the city turn over quickly. Additionally, the debtor has amassed significant funds during this case of $675,000.00 that will allow it to service the debt in the first year when the projections are tightest. Thus, no adjustment is needed based on this factor. Additionally, given the debtor's modification of its plan treatment from a twenty-five year term to a ten-year term, the length and feasibility of the plan require no upward adjustment. The court notes that this alteration of the note term undercuts Mr. Lea's opinion, who stated that the original twenty-five year term was "another cause of the substantial difference in interest rate pricing for the Plan." Creditor's Exhibit 6 at 4.

Finally, the court turns to the secondary factors relevant under Till, the loan to value ratio and the quality of guarantors. Because of the pending objection to a portion of the creditor's claim, the loan-to-value ratio cannot be precisely computed. However, it does not fall within the 70% rate the market would currently require. There was no testimony about guarantors, so the court presumes that no solvent guaranties back up this note. These factors require an upward adjustment of 0.25%.

The plan treatment for the secured creditor sets a rate of 3.75% or such rate as the court requires. The court's Till rate of 5.25% falls within the offered treatment, and the debtor's projections demonstrate that it can feasibly make these payments. Accordingly, the objection to confirmation on this basis is overruled.

## CONCLUSION

-10-

The other provisions of § 1129(a) were satisfied by the debtor at the confirmation hearing. Accordingly, for the reasons set forth above, the debtor's plan may be confirmed. CWCapital's motion to dismiss, which was based on the debtor's inability to confirm a plan is **DENIED**. Counsel for the debtor is directed to submit to the court the standard order of confirmation, accompanied by a restated plan consistent with this opinion.

**END OF DOCUMENT**